## Bracken Estate (No. 2)

*J. Ernest Nachod,* for accountants.

*Bernard E. DiJoseph* and *M. Paul Smith,* for claimants.

*David E. Groshens,* for Helen Cash and Shirley Morrow.

*H. Lyle Houpt,* for Dorothy S. Smith.

TAXIS, P. J., December 12, 1957.—Marie Bracken died testate on January 9, 1948, a resident of Cheltenham Township, Montgomery County, survived by two sons, Thomas B. and James, and leaving a will dated

October 31, 1947, and probated on January 15, 1947. At the time of her death she was seized of three pieces of real estate, (1) 601 Glenside Avenue, Glenside; (2) 207 Greenwood Avenue, Cheltenham; and (3) 14-16 South Avenue, Wyncote.

By item fifth of her will she devised 601 Glenside Avenue to the trustees in trust for the life of her son, Thomas V. Bracken, and directed that ". . . my Trustees shall, from time to time, pay the taxes, sewer rent, fire insurance premiums, as they shall become due and payable and may also at their option, pay for such repairs to said premises, as, from time to time, they may deem necessary or proper, such payments to be charged against monies otherwise payable to said son under this Will. Upon his death, the same shall form a part of my residuary estate. . . ."

This leaves for determination the claims of Mrs. Ruth Bracken and of Montgomery County Bank and Trust Company, executor of the will of Thomas V. Bracken, deceased. The claim of Ruth Bracken individually seeks reimbursement of $3,852.76 expended by her for capital improvements to premises 601 Glenside Avenue; the claim of the executor of Thomas V. Bracken's estate is for reimbursement of $3,373.60, expended by Thomas in his lifetime based also on capital improvements made by him.

It should be stated at the outset that this real estate was in deplorable condition when Mr. and Mrs. Bracken decided to move in. Extensive testimony detailing this almost uninhabitable condition was submitted. Very little if any testimony was submitted to the contrary.

All parties agree also that the amounts of expenditures are not in dispute but that the bills for such expenditures have been paid. The real dispute is whether the expenditures should be borne by the life tenant or by remainder interests.

"A life tenant must preserve the demised estate in as good condition as it is received, natural depreciation excepted . . . 'the life tenant cannot of his own motion improve the remaindermen out of their estate.' For permanent improvements, adding to the value of the inheritance, a life tenant is only ratably liable, especially if assented to or acquiesced in by the remaindermen. . . . To determine the apportionment of the expense between the life tenant and remaindermen, the equities must govern . . .": Farber's Estate, 70 Pa. Superior Ct. 81, 86. See also Hoyt's Estate, 236 Pa. 433, and Oberly's Estate, 39 Berks 207.

Mrs. Bracken makes claim for the following items: Storm door, $87; venetian blinds, $158; humidifier, $50.50; insulation, $48; heat leads and registers, $111.10; water heater, $124; storm windows, $554; lock and medicine cabinet, $71; plumbing and flooring, $2,649.16.

From the testimony it is clear that the humidifier, door lock, medicine cabinet and the venetian blinds (totaling $279.50) are appliances, or furnishings installed for the personal comfort of the tenant. Therefore, the claim for these amounts is without merit and is herewith dismissed.

Conversely, the following items show an increase in the value and extension of the useful life of the property and are therefore capital improvements which enhance the value of the estate and redound to the benefit of the remaindermen and to that extent should be borne by them, as follows: Storm door, $87; insulation, $48; heat leads and registers, $111.10; water heater, $124; storm windows, $554; making a total of $924.10. These items constitute capital improvements enhancing the value of the remaindermen's estate, are meritorious claims and are herewith allowed.

40

This leaves for consideration the final claim of plumbing and flooring in the amount of $2,649.16.

The facts pertaining to this part of the claim need be recited in some detail. Thomas, in his lifetime, borrowed $4,450 from the trustees to repair the plumbing and the flooring of this house and before his death had repaid all but $2,600. Mrs. Ruth Bracken paid the balance from her insurance moneys. It is difficult if not impossible to determine what portion constitutes repairs and what constitutes capital improvements because this claim clearly partakes of both. From the evidence, however, it would appear that the remaindermen have been enhanced to some degree and I allow on the amount of this claim the sum of $1,000 in addition to the other claims just allowed. The claim of Mrs. Ruth Bracken, therefore, is allowed in the total sum of $1,924.10 to be paid out of the principal of this trust.

Turning then to the claim of Thomas Bracken Estate, the evidence establishes that the following items paid by Thomas Bracken in his lifetime are capital improvements and thus the estate should be reimbursed as follows: Oil heater, $904; toilet and kitchen repairs, $940; gas water heater, $91.99; storm windows, $348, making a total of $2,283.99 to be paid out of the principal of this trust.

It is curious, although, of course, not in any way controlling, that the two claims, as thus allowed, total $4,208.09, and that this closely approximates the figure set forth in the trustee's account wherein a short entry reads as follows: "Approximately $4000 has been spent on capital improvements since the death of Marie A. Bracken . . .".

All other claims are dismissed.

Thomas Bracken's estate claims an additional amount of $1,800, representing the payments made by Thomas in his lifetime on account of his original loan

of $4,450 plus $229.02 representing interest on the loan.

The testimony establishes that Thomas Bracken borrowed $4,450 from the trustee, and to secure this loan took out a life insurance policy which was pledged as collateral. The policy was in the amount of $3,300 so that when Thomas died, insurance moneys were used to pay the balance due, namely, $2,650. Mrs. Bracken was paid the remaining balance, i.e., $700. Thomas Bracken, however, in his lifetime, paid $1,800 of his own funds, which his estate now claims. In support of this claim exhibit C-8 was submitted in evidence showing the bill of A. E. Kirschner, a contractor and builder, in the amount of $3,509.16. An examination of this bill indicates that a substantial number of the items there listed are obviously repairs. Moreover, one item totaling $1,577 is merely listed as "work as estimated". This is neither helpful nor of any weight to the court, for the court cannot deduce therefrom what should be apportioned to the life tenant and what to the remaindermen. Since patently the entire amount could not be charged against the remainder interests, the burden was on claimants to establish by clear and satisfactory evidence what proportions should be borne by the remaindermen. Claimants have failed to meet the burden of proof. The contractor was not called to testify as to his bill, although the court is advised that he was available. It would appear clear that Thomas Bracken considered this loan as an advance on account of his income payments. On July 1, 1953, and then again on September 29, 1953, he promised to reimburse the trustees agreeing that the trustees ". . . deduct such annual [income] payments from monies due me from the estate, and I have assigned as collateral Prudential Insurance Company policy No. 19455840 on my life. Trustees are authorized to pay the annual premiums due on same of $62.95, as same become due, to

be charged to monies coming to me from said estate."

Thomas Bracken anticipated his income to the extent of this loan and despite his statements to the contrary, looked upon them as improvements redounding to his own comfort and benefit. This claim is herewith disallowed.

During the course of the hearings it was suggested that Mrs. Bracken's claim be reduced by setting off the amount of rent for use and occupancy of this property by Mrs. Bracken for the period of approximately 24 months during which she resided in the property since the death of her husband.

The claim for set-off is without merit and is hereby dismissed. " 'The relationship of landlord and tenant is always created by contract, either express or implied. It cannot exist without such a contract . . .' ": Wilson Estate, 349 Pa. 646, 649. Mrs. Bracken continued living in the house of her deceased husband under the mistaken impression that she had a right to so remain for the rest of her life. Not until September 26, 1956, was she notified by one of the trustees to vacate these premises, and her confusion was only compounded when, a month later, the other trustee was active in aiding Mrs. Bracken to arrange to continue her occupancy of the house. Clearly, then, no express contract existed between the parties establishing the relationship of landlord and tenant, and Mrs. Bracken's position as widow of the deceased life tenant, continuing to dwell in what she considered to be her home after her husband's death, coupled with the misleading and vacillating attitude of the trustees, contravenes any idea establishing the existence of an implied contract. The statement of the court in Shelleman Estate, 7 Fiduc. Rep. 207, at 209, is apropos to this situation:

"There is no contention that any express contract existed between this widow and her deceased husband or the executrices of his estate, requiring her to pay

rent. They base their right to recover rent wholly on an implied promise to pay for use and occupancy. The action for use and occupancy of land is founded upon privity of contract. They must prove a contract to pay either a stipulated compensation for the use of the land or such a sum as the use is reasonably worth. The relationship of the parties here precludes all inference of a contract, either express or implied, to pay rent for the occupation of the homestead. ... ."

And now, December 12, 1957, this adjudication is confirmed nisi.